## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

ANGIE RODRIGUEZ,

                Plaintiff,

v.                                                                    No. CIV 11-238 JEC/LFG

PRESBYTERIAN HEALTHCARE
SERVICES, and JOSEPH McSWEENEY,

                Defendants.

## REPORT AND RECOMMENDATION[1]

### Introduction

THIS MATTER is before the Court in accordance with an Order entered by District Judge John E. Conway on March 22, 2012, referring the Defendants' "Motion to Dismiss and Request for Attorney's Fees and Costs as Sanctions for Plaintiff's Abuse of the Discovery Process" [Doc. 30] to the undersigned Magistrate Judge to make findings and a recommended disposition under 28 U.S.C. § 636(b)(1)(B). [Doc. 62.]  On December 28, 2011, Defendants filed the motion to dismiss based on alleged discovery abuse by Plaintiff Angie Rodriguez ("Rodriguez").  On January 20, 2012, Rodriguez filed a response in opposition to the motion [Doc. 42],[2] and on February 9, 2012,

_____

[1]**Within fourteen (14) days after a party is served with a copy of this report and recommendation, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendation.  A party must file any objections within the fourteen-day period allowed if that party wants to have appellate review of the analysis and recommendation. If no objections are filed, no appellate review will be allowed.  *See, e.g.*, Wirsching v. Colorado, 360 F.3d 1191, 1197 (10th Cir. 2004) ("firm waiver" rule followed in Tenth Circuit holds that a party who fails to object to magistrate judge's findings and recommendations in timely manner waives appellate review of both factual and legal questions). Rodriguez's objections are due no later than April 20, 2012.**

[2]In Rodriguez's response, she also asks that sanctions be assessed against Defendants and requests her attorney's fees and costs incurred in responding to the motion to dismiss. [Doc. 42, at 23-24.] The Court does not address this request.  Had Rodriguez wanted the Court to consider sanctioning Defendants, she was required to file a separate motion to that effect.  *See* Adm. Order No. Misc. 92-88

Defendants filed a reply [Doc. 49.]  The Court thoroughly reviewed the pleadings, exhibits, and pertinent law.  There is no need for a hearing before entering this report and recommendation.

## Background

On March 16, 2011, Rodriguez filed her complaint for damages alleging violations of the Family and Medical Leave Act ("FMLA") (including interference, retaliation, and elimination of job claims), constructive discharge, breach of an implied employment contract, and breach of the implied covenant of good faith and fair dealing.  Rodriguez requests an award of damages for lost back wages and benefits, present and future wage losses and benefits, and mental, emotional, and psychological distress.  She also seeks an award of punitive damages. [Doc. 1, Complaint.]

More specifically, Rodriguez alleges, *inter alia*, that while employed by Defendant Presbyterian Healthcare Services ("PHS"), PHS and her supervisor Defendant Joseph McSweeney ("McSweeney" or "Defendants") interfered with her FMLA rights and privileges.  According to Rodriguez, Defendants required her to work [at PHS] while on FMLA leave, harassed her because she had taken FMLA leave, required her to return to work in circumstances that violated FMLA, and changed the terms and conditions of her employment due to election of FMLA rights. [Doc. 11, Joint Status Report, at 2.] Rodriguez further contends that Defendants retaliated against her for taking FMLA leave by removing her from her job, changing her job duties, replacing her while she was on FMLA leave, creating a hostile work environment, demoting her, and failing to pay her in accordance with her position title. [Doc. 11, at 2-3.]

Rodriguez also claims, *inter alia,* that PHS constructive discharged her by creating "unjustifiable work stress" in relation to the imposition of an "unrealistic workload," refusing to pay

---

(requiring practitioners in this District to submit a separate pleading addressing a motion or request).

her appropriately, subjecting her to a hostile work environment and harassment, and eliminating her job at various points in time. Rodriguez states "at no time," did she desire to end her PHS employment and that the acts and failures to act by PHS "so compromised her health and future PHS employment that she had no choice but to resign." [Doc. 11, at 3.]

Rodriguez supports the claims of breach of implied employment contract and breach of the covenant of good faith and fair dealing with similar allegations.

Defendants state that Rodriguez was hired in October 2006 as an HR Compensation Consultant. In March 2007, PHS posted an opening for a Senior Compensation Consultant. While Rodriguez was not a viable candidate for the position, she requested and received the opportunity to be trained and mentored for the position. According to Defendants, Rodriguez was given salary increases and adjustments to reflect her role and responsibilities.

Defendants further allege that beginning in March 2010, Rodriguez requested and received both intermittent and regular FMLA leave, along with other benefits. They claim Rodriguez was never removed from her position, demoted, or subjected to retaliation or a hostile work environment. [Doc. 11, at 4-5.]

PHS contends that on June 2, 2010, Rodriguez was advised that she had used 8 of her available 12 weeks of FMLA leave and had 4 remaining weeks of job and benefits protection. She submitted her resignation that same day, effective June 21, 2010, claiming she had been discharged and was "involuntarily" terminated. Ultimately, Rodriguez provided PHS with certification from her healthcare provider to support her FMLA leave stating that she was able to return to work without restrictions on June 7, 2010. When she did not return to work by June 21, 2010, PHS notified Rodriguez that she had been placed on unpaid leave since June 7, 2010, she was expected to return to her position, and her position was available to her. [Doc. 11, at 5.] Rodriguez allegedly

3

informed Defendants she would not be returning and resigned.   Defendants further denied Rodriguez's allegations and claims. [Doc. 11, at 5-7.]

Presently, in addition to the motion at issue, Defendants have filed two motions for summary judgment – a motion for summary judgment that is not fully briefed and a partial motion for summary judgment based on after-acquired evidence that is fully briefed. [Doc. Nos. 34, 35.]

### Defendants' Motion to Dismiss for Alleged Discovery Abuses

Defendants seek dismissal of this lawsuit, in its entirety, as a sanction for Rodriguez's alleged "pattern of lies and evasion during discovery." [Doc. 30, at 1.] They explain that after granting Rodriguez FMLA and short-term disability ("STD") benefits based on her paperwork indicating she was not able to work at all, Rodriguez obtained employment at the Hard Rock Casino and began working there while receiving the before-mentioned benefits from PHS.

According to Defendants, during her deposition, Rodriguez lied about the details of her employment at the casino, including her starting date of employment at the casino and her work hours.  In addition, Rodriguez allegedly responded "I don't remember," or "I don't recall" over 350 times during her deposition.   The questions she could not answer related to her own recent employment and business history, her earnings, her salary increases, her tax returns, her retirement benefits, her prior mental health counseling regarding her husband's extra-marital affair, her husband's employment history, and her 2008 bankruptcy.

Specific to Rodriguez's casino employment, Defendants state that just seven days after Rodriguez sought and obtained full-time FMLA leave and STD from PHS (on April 20, 2011), and certifying to PHS that she was unable to perform work "of any kind," Rodriguez began working on April 27, 2011 as a blackjack dealer at the casino.  On May 4, 2010, one week after she began working at the casino, Rodriguez submitted another letter to PHS from a counselor stating

4

Rodriguez was still "unable to work at this time" and that she would be reassessed on May 21, 2010. Rodriguez remained on STD until May 24, 2010, and remained on full-time FMLA leave until June 4, 2010.  On June 7, 2010, Rodriguez submitted a letter of resignation, effective June 21, 2010.[3] [Doc. 30, exhibits.]

After Rodriguez applied for and received full-time FMLA and STD benefits from PHS in April 2010, she did not disclose to PHS that she started working at a casino on April 27, 2010. Based on the record before it, Rodriguez did not make this disclosure to PHS until early to mid-June 2010, after she already was receiving FMLA and STD benefits.  PHS personnel testified they did not learn of Rodriguez's casino employment until after she submitted the June 7, 2010 resignation letter.

The Court acknowledges that Rodriguez disputes the timing of when PHS learned of her casino employment and claims that they knew during the first or second week of May 2010 that she was employed at the Hard Rock Casino.  As explained in more detail below, this dispute is an example of Rodriguez's conflicting and false testimony.  Indeed, in order for Defendants to obtain accurate information concerning Rodriguez's casino employment, they had to request Rodriguez's payroll documentation from the casino and take depositions of two records custodians.  Rodriguez, in her deposition, supplied false information about the dates and hours of her blackjack dealer job.

_____

[3]Rodriguez's June 7, 2010 email (cover letter) to Defendant McSweeney stated it was with "great remorse" that she was attaching her "letter of resignation." [Doc. 30, Ex. 9.] In her actual attached letter, Rodriguez stated she was "involuntarily resigning [her] employment. . . ."  Rodriguez asserted that a hostile work environment existed and that "[d]ue to the nature of the unpleasant and negative communications I have had with Pres management since I have missed work due to complications with my health, I feel it is in my best interests to leave the organization in order to maintain my well-being." [Id. June 7, 2010 letter.] It is undisputed that Rodriguez was working as a blackjack dealer at the casino on the date of this letter.

In the briefing, Defendants summarized about 15 pages of deposition testimony where Rodriguez either gave false and inaccurate answers or essentially no answers to questions.  The Court does not recount all of that deposition testimony here, but provides excerpts of some of the deposition testimony below.  The following example demonstrates Rodriguez's lack of candor, if not downright dishonesty, about when she started to work at the casino and what hours she worked.

Q.    And when did you go to work for Hard Rock Casino?
A.    In May.
Q.    In May of 2010?
A.    Yes.
...
Q.    What kind of hours were you working at the Hard Rock Casino?
A.    It was a weekend position.  By the time I ended my employment, I was only working Saturday in the evening.
Q.    So when you started – When you say "weekend," do you mean Saturday and Sunday?
A.    Yes.
Q.    Would it include Friday night?
A.    Possibly.
Q.    Do you recollect whether you worked Friday nights?
A.    I don't remember.
Q.    And when you worked on Saturdays and Sundays, did you work during the day or in the evening?
A.    It was in the evenings.
Q.    What were your hours?
A.    From 7:00 p.m. to approximately 12:00, one o'clock in the morning.

[Doc. 30, at 3-4 (*citing* Plaintiff's deposition testimony).

Rodriguez's casino payroll records confirm she started working there on April 27, 2010, when she attended 6.5 hours of orientation during the day.  On Thursday, April 29, 2010, Rodriguez worked from about 11 a.m. to 6 p.m.  On Friday, she worked from about 11 a.m. to 5 p.m.  She did not work that first weekend and returned to work at the casino on Monday May 3, from about 1 to 2 p.m, and then on Wednesday from 11 a.m. to 6 p.m.  Rodriguez continued working weekdays at the casino through May, during similar daytime hours,  and worked some evening hours in June

2010.  Contrary to Rodriguez's deposition testimony, there is no indication that she worked weekends during this time frame. [Doc. 30, at 4-5 (*citing* Hard Rock Casino timecards for Rodriguez).] Rodriguez worked most of these dates/hours at the same time she received FMLA and STD benefits from PHS.

The following example of Rodriguez's deposition testimony and subsequent affidavit testimony again demonstrate Rodriguez's false, misleading, and contradictory information.

> Q.   Now, before you left Presbyterian's employment, is it true that you had told people at Presbyterian that you had accepted this job at the Hard Rock Casino?
> A.   I had told Ed DeJesus.
> Q.   What did you tell Ed?
> A.   That I was offered employment at the casino.
> Q.   And do you remember when you told him that?
> A.   No.

[Doc. 49, Ex. 3, Rodriguez Dep., at 64.]

The above-cited testimony was elicited during Rodriguez's deposition on August 16, 2011, but in her later affidavit, signed January 27, 2012 [Doc. 43, Ex. D], Rodriguez remembered the communication with Mr. DeJesus much more favorably in relation to her position.  She averred in the affidavit:

> 2.   In the first or second week of May 2010, I had a telephone conversation with Ed de Jesus, the PHS Human Resources manager assigned to the Compensation Department, regarding my work status. During the course of that conversation, I notified Mr. De Jesus that I was working at the Hard Rock Casino.
>
> 3.   Mr. De Jesus knew that I was on both FMLA leave and Short-Term Disability (STD) leave at the time of our conversation.  Mr. De Jesus was one of the PHS management employees involved in the handling of matters related to my FMLA and STD leave.
>
> 4.   During a later conversation with Mr. De Jesus, he stated to me that he had advised Joseph McSweeney and the PHS Employee Relations Director of my employment at the Hard Rock Casino.

[Doc. 43, Ex. D, Plaintiff's Affidavit, at ¶¶ 2-4.] In contrast to her affidavit, Rodriguez testified in the deposition that she had spoken to Mr. De Jesus about "an offer" of employment from the casino but did not know when that conversation occurred and moreover, did not testify then that she actually already was working for the casino.[4]

In a letter to Rodriguez from McSweeney, dated June 21, 2010, McSweeney clarified to Rodriguez that her former position was still available, notwithstanding her letter of resignation, and that they neither intended to nor did create a hostile work environment.  Instead, PHS hoped Rodriguez would return to her former position.  At the end of the June 21, 2010 letter, McSweeney stated:

> I understand that, last week, you informed Ed de Jesus, a Human Resources Business Partner, that you have selected a new job in a new field and that you would not be returning to work at PHS.  In that event, your PHS employment will end effective June 18, 2010.

[Doc. 43, Ex. A.] Thus, according to McSweeney's letter to Rodriguez, McSweeney was unaware that Rodriguez was working at a new job in April or May 2010, and had just learned in mid-June that Rodriguez had "selected a new job."  Moreover, Rodriguez's supervisor, Margaret Eaton, testified in her affidavit that Eaton did not learn about Rodriguez's casino employment until after Rodriguez resigned.  She stated:

> About one week after Ms. Rodriguez resigned her position on June 7, 2010, I learned from Ed de Jesus that Ms. Rodriguez had begun working for the Hard Rock Casino prior to her resignation and while receiving Family and Medical Leave and Short-Term disability benefits.

---

[4]This Court need not make any determination as to whether the subsequent affidavit should be disregarded.  However, it observes that, depending on various circumstances, "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986) (citation omitted).

[Doc. 33, Ex. 1, Eaton Affidavit, at ¶ 4.] In view of Rodriguez's own conflicting statements, along with affidavit testimony by PHS employees and casino documentation, the Court concludes that Rodriguez provided false information concerning her casino start date, working hours, and when she informed PHS of her other employment.

Another example of Rodriguez's unexplained falsehoods and obvious obstruction of the discovery process concerns her allegations that she was not properly compensated during her PHS employment and her deposition testimony that she did recall any raise she received in July 2009. She testified as follows:

Q.   Now, in July of 2009, did Mr. McSweeney recommend and get approved a pay adjustment for you?
A.   No.
Q.   During the time he was your direct supervisor, was there ever an occasion where he recommended and obtained approval for a pay adjustment for you?
A.   Not that I'm aware of.
     [Deposition Ex. 25 was marked for identification.]
Q.   Have you seen Ex. 25 before?
A.   No.
Q.   Have you seen forms like this before at Presbyterian?
A.   Yes.
Q.   What are these kinds of forms used for?
A.   For personnel action changes.
Q.   ... Well, did you ever, at Presbyterian, fill out these kind of forms?
A.   Yes.
Q.   ..., if you were doing a compensation analysis on a particular position and it resulted in a pay change, would you fill out a form like this?
A.   I don't remember.
Q.   ... If you'd look at this particular form, Ex. 25, near the top where it says "HR Use only," and then there's a list of things . . . .
A.   Yes.
Q.   -this particular one appears to have an "X" by the words "Pay Change."  Do you see where I'm referring to?
A.   Yes.
Q.   Okay.  Have you ever filled out that particular field or box that says "HR Use Only?"
A.   I don't remember.
Q.   What's your understanding of a pay change?
A.   A pay change.
Q.   Okay.  What's your understanding of it?

9

A.   A change in pay.

Q.   And I know it's very hard to read because it's dark, but further down, there's a field in the dark "Primary Hourly Rate" on the left.

A.   Yes.

Q.   And then 34.9552.  Do you see that?

A.   Yes.

Q.   And that indicates you were receiving a pay change from $32.66 to $34.95 doesn't it?

A.   This was at the time when all pay increases went through.

Q.   That wasn't my question though.  This document indicates that that was the pay change you received.

A.   It appears so.

Q.   . . . And were you informed of that pay change when it occurred?

A.   I don't remember.

Q.   Did you have any discussions with Mr. McSweeney about this pay adjustment?

A.   I don't recall.

Q.   And down below a little further, there's a field called "Comments".. Do you see that?

A.   Yes.

Q.   Do you have any understanding of what that means?

A.   I've never seen this document.

...

Q.   So you think that this was part of an across-the-board pay adjustment?

A.   I've never seen this document before.

Q.   That wasn't my question.

A.   I don't  – I don't know what this increase is for.

Q.   But, I thought you were trying to tell me that it was some sort of across-the-board increase for all–

A.   I was looking at the date stamp.

...

Q.   Now is it your testimony that you were not even aware that you received this pay increase.

A.   No, I don't have any recollection of the document.

Q.   Not just the document, but do you –

A.   I don't remember a specific – this specific pay change.

Q.   Is today the first time you are aware that your pay was increased from $32.66 to $34.95?

A.   I don't remember the exact pay change that occurred that's with the annual increase.

Q.   That wasn't my question.  Is today the first time that you became aware that you received a pay increase from 32.66 to 34.95?

A.   I don't know if I received this.

Q.   That's still not my question . . . .

Mozes:   Objection to form.  But you can answer it.

A.   I don't know that I received this.

Q.   The pay increase?

A.   Yes.

10

[Doc. 30, at 14-15 (*citing* Rodriguez's Dep. at 123-128).]

In direct conflict with her deposition testimony that she could not remember such a pay raise at all, Rodriguez produced, as part of her Initial Disclosures, a "print-screen" of her Pay History showing the 7/12/09 increase, including her notes on that document calculating her alleged damages. In reference to the July 2009 raise, Rodriguez apparently wrote on the pay history form: "Note: In range adjustment: 7/12/09 - should be disregarded if classified appropriately in 8/07." [Doc. 30, at 15 (*citing* Ex. 12, Plaintiff's Pay Rate History with handwritten notes).]

This excerpt of Rodriguez's evasive deposition testimony, coupled with the conflicting initial disclosure, is an example of deliberate and deceptive conduct by Rodriguez. It defies belief that Rodriguez knows so little about her own pay history and the compensation process, particularly in view of her job at PHS as a compensation consultant. Even when confronted with documentation of her pay raise in July 2009, that she provided to Defendants, Rodriguez continued to, at a minimum, "play games" with the questions being posed. She proceeded to obfuscate the truth, thereby undermining the truth-seeking role of the judicial process, a process she set in action by filing a complaint.

In addition to these excerpts of Rodriguez's deposition testimony, there are endless examples of Rodriguez's answers of "I don't remember" or "I don't recall," to questions that were relevant and within her personal knowledge. She was asked if she met with supervisor Eaton on occasion to discuss elimination of her position and Rodriguez's stated desire that her position be eliminated so she could collect severance pay. Rodriguez "did not remember" this discussion with Eaton or any part of it.

Regarding basic information about Rodriguez's salaries at other positions, she repeatedly answered she did not remember. For example, it was "possible" that she worked more than 40 hours

at UNMH but she did not remember.  She did not remember what salaries she made while employed at UNMH, Lovelace, or with the City of Albuquerque.  She did not remember if she accepted a position at PHS before leaving Lovelace.  She did not know if the salary she obtained at PHS was more than what she earned with her prior employer, Lovelace.  She did not remember if "compensation HRIS analyst" was her position at Lovelace or whether she was promoted on that job.  Even with respect to her casino job, Rodriguez did not remember her rate of compensation or how much she might have been tipped on a good or bad night, or any night. [Doc. 30, Rodriguez Dep. at 58-59.]

In order to obtain information pertaining to Rodriguez's emotional distress claims, Defendants asked Rodriguez about marital counseling in 2008-2010.  Rodriguez remembered few details about her counseling.  She did not know the name of the counselor, when her husband had an affair, where the counselor's office was, what year she saw the counselor, or how many appointments she had.

Rodriguez was questioned about her bankruptcy filing in 2008 but did not remember if the amount of liabilities was more or less than a half million dollars, or more or less than $10,000-$100,000.  When asked about her husband's occupation in 2005, Rodriguez did not remember what he did.  She did not recall if he had earnings in 2006 or was on unemployment compensation in 2006.  When asked about a business she and her husband owned from 2005 to 2006, Rodriguez did not remember when they formed the business, the location of the business (her husband similarly testified he did not know where their business was located), how long the business existed, or whether she received a paycheck from that business.  [Doc. 30, at pp. 6-12 (*citing* Plaintiff's Dep.).]

It is difficult to know why Rodriguez, in essence, refused to answer so many questions that pertained to relevant issues and matters generally within her personal knowledge.  The Court can

speculate that she may have believed the questions were irrelevant to her claims and thus, refused to provide the requested details.  However, this was not her decision to make.  While some of the requested information might not have been admissible at trial, under Rule 26(b)(1), parties can obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.

If Rodriguez or her attorney believed that the questions sought privileged information or that she had no obligation to answer questions fully or truthfully, they should have raised that issue before the Court to obtain a ruling.  Another possible explanation for Rodriguez's lack of candor and false responses to questions is that she wanted to hide certain information, especially the information that would have been detrimental, or that, as at least one court has characterized it, she wanted to "cheat to win."  Whatever the reasons for Rodriguez's recalcitrance and false answers, the Court finds that she engaged in willful misconduct and conscious obstruction during discovery.

### Plaintiff's Response to the Motion to Dismiss

Rodriguez's response to allegations of discovery abuse takes several tacks: (1) Rodriguez was not nearly as recalcitrant a witness during her deposition as was Defendant McSweeney in his deposition; (2) she did not lie during her deposition; and (3) any "inaccuracies" in Rodriguez's testimony were due to lack of memory, because of irrelevant and immaterial questions, or did not matter.

### 1.   *McSweeney's Testimony and Plaintiff's Request for Sanctions*

Plaintiff devotes about 7 pages of her response to citing testimony by McSweeney that she contends demonstrate McSweeney engaged in misconduct.  Contrary to Rodriguez's answers or lack thereof, Plaintiff argues that McSweeney's "lack of recall went straight to the heart of a number of issues in dispute between the parties." [Doc. 42, at 10-17.]  Unlike McSweeney's testimony, Rodriguez contends that she "principally could not recall events and dates related to non-material

13

matters from years ago . . . ." [Doc. 42, at 17.] In her responsive pleading, Rodriguez argues that

should the Court impose any sanction on Plaintiff, the Court should impose a "greater sanction" on

Defendants for McSweeney's "knowing and intentional failures" during his deposition.  Rodriguez

further asks that the Court preclude McSweeney from testifying at trial regarding specific matters.

[Doc. 42, at 23.]

As noted *supra*, Rodriguez's request for sanctions as to McSweeney's conduct during the

discovery process cannot be raised in a response to a motion by Defendants.  *See* Administrative

Order No. Misc. 92-88 (a party may not join a request for other relief in a response to a motion).

This is improper.  One additional problem with this approach is that the matter is not fully briefed.

Moreover, if Plaintiff had wanted  the Court to sanction McSweeney, she should have filed a

separate motion to this effect.  Thus, the Court does not address this request for sanctions, nor does

it engage in a comparative analysis of the two parties' deposition testimony in order to determine

the merits of Defendants' motion.

### 2.    *Denial of Lies*

Rodriguez contends that she did not lie about her casino employment and that there is no

supporting evidence to the effect that she lied.  According to Rodriguez, she merely relied on the

"start date information at Hard Rock she received from the casino itself." [Doc. 42, at 2.] Rodriguez

argues that Hard Rock casino provided misinformation when she asked casino personnel for her start

date. [Doc. 42.]

Rodriguez attached her affidavit, signed January 20, 2012, stating that she contacted Hard

Rock casino sometime after she left its employment in November 2010 to verify her period of

employment.  She did not recall who she spoke to but the individual advised Rodriguez that her

employment began in May 2010. [Doc. 42, Ex. A, Rodriguez Affidavit, at ¶ 1.] Rodriguez stated that

14

she later learned that her start date was actually April 27, 2010, at which point she called the Hard Rock HR Department in early January 2012, and requested a letter explaining the Hard Rock originally provided her with incorrect information. Rodriguez attached an unnotarized letter, dated January 12, 2012, addressed "To Whom it May Concern," stating that Rodriguez was employed at Hard Rock from 4/27/2010 to 11/20/2010, and that she was given incorrect information when she called to verify her employment. [Doc. 42, Ex. A, attached letter.]

The casino's unsworn January 2012 letter does little to confirm who Rodriguez spoke to over a year earlier or whether that conversation was documented in November 2010. It is speculative at best. Moreover, it does nothing to counter Plaintiff's false information that she worked only weekends or in the evenings at the casino. That incorrect information was not rebutted by the letter or by Rodriguez, who merely argues that the question contained no limitation as to time frame, and Rodriguez answered it "in the long-term context of her entire casino, not the slice of time Defendants foist on the court." [Doc. 42, at 4-5.] The question was not addressed to the "long-term context" of her employment. Indeed, defense counsel asked Rodriguez "So when you started - When you say 'weekend,' do you mean Saturday and Sunday?" Rodriguez answered: "yes." [Doc. 30, Rodriguez Dep. at 60.] Thus, the questions were directed to the start of Rodriguez's casino employment, and the answers, as confirmed by casino time cards, were blatantly false.

Rodriguez also takes issue with what she characterizes as "incorrect inferences" that the Defendants allegedly drew from FMLA paperwork she provided to PHS. For example, she argues that the Certification of Healthcare Provider form pertains "only to the functions and duties *of Rodriguez's PHS position*." [Doc. 42, at 3] (emphasis in original). The actual question on the paperwork is: "If medical leave is required for the employee's absence from work because of the employee's own condition, is the employee unable to perform *work of any kind*? Answer: "yes."

[Doc. 30, Ex. 1, p. 2] (emphasis added).  The Court finds that Rodriguez's position, while constantly shifting, is unpersuasive.  Her inability to work at PHS as an HR compensation consultant due to anxiety, depression, and ongoing headaches is flatly inconsistent with her ability to work in a casino environment as a blackjack dealer late at night (even though her hours were generally during the workday, despite her testimony to the contrary).

Similarly, her EAP consultant's letter, dated May 4, 2010, states she was assessed that day and "found unable to return to work at this time." [Doc. 31, Ex. 5.] The most logical inference is that she was unable to work at that time  – period.  The letter does not specify that she was unable to perform her job at PHS, with an inference that she could work elsewhere or anywhere other than at PHS.

With respect to timecard information for Rodriguez's casino work in 2010, Defendants inadvertently or mistakenly referred to the work dates as occurring in April-June **2011**, rather than 2010. [Doc. 30, at 4-5.] But, the actual days and dates recited by Defendants correspond to the 2010 calendar.  For example, Rodriguez's timecard showed that she worked on Friday, 5/7 for 6.8 hours.  May 7, 2010 was a Friday. [Doc. 30, at 4.]   In Plaintiff's response, she mistakenly stated that Rodriguez worked on 5/7, a Saturday.  However, it is true that Rodriguez demonstrates she worked some weekend and evening hours during the April-June 2010 time frame, in addition to the hours detailed in Defendants' briefing.  The primary impression made, however, is that Rodriguez worked even more hours at the casino while also accepting FMLA and STD benefits from PHS, than shown by Defendants in their briefing. [Doc. 42, at 5-6.] That point is contrary to Rodriguez's position that she was entitled to FMLA leave because she was unable to work.  Moreover, the Court disagrees with Rodriguez's argument that weekends were her "principal work time as confirmed by records."  When examining both the time card information from Defendants' and Plaintiff's briefs, it is clear

16

that Rodriguez worked day hours, night hours, weekday hours and weekend hours.  The time card information flatly refutes Rodriguez's sworn representations.

### 3. *Lack of Memory*

Rodriguez primarily explains her repeated responses of "I don't know" and "I don't recall" by arguing the questions being asked were not relevant to her claims, *i.e.,* the bankruptcy "has no relevance," the 2005 and 2006 tax returns "have no bearing" on the claims," the location of the Rodriguez business and the length of time it operated "has no relation to any fact of consequence," the early withdrawals from retirement plans "have no relevance to the damages sought," inquiries about student loans on a 2007 tax return "have no relevance," and salary information at prior employers "is irrelevant and immaterial to any claim." [Doc. 42.]

As suggested *supra*, it is improper for Rodriguez to decide at her deposition what questions she will fully answer based on her assessment of the relevancy of those questions.  Fed. R. Civ. P. 30(c)(2) requires that deposition testimony be taken subject to objection.[5]  In other words, defending counsel may state an objection, but the deponent is required to answer.  "Relevance is an issue to be determined by the court when evidence is sought to be admitted, not by the parties during a deposition."  <u>Kingston v. Nelson</u>, 2007 WL 2985046, *6 (D. Utah Oct. 11, 2007) (unpublished) (*citing* Fed. R. Evid. 401, 402).  *See* <u>Herbert v. Lando</u>, 441 U.S. 153, 177 (1979)  ("The Court has more than once declared that the deposition-discovery rules are to be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials.")  Depositions are an integral part of the trial's truth finding process.

---

[5]Rule 30(c)(2) provides: "An objection at the time of the examination–whether to evidence, to a party's conduct, to the officer's qualifications, to the manner of taking the deposition, or to any other aspect of the deposition–must be noted on the record, but the examination still proceeds; the testimony is taken subject to any objection,."

Defendants asserted, for example, that Rodriguez's 2008 bankruptcy was relevant to her allegations in the complaint that her work environment was so disturbing as to cause her stress and headaches in 2009 and 2010. Defendants further argued they were entitled to discover what other factors, including Rodriguez's financial issues and marital counseling, could also have caused stress. While Rodriguez attributes her alleged current emotional stress to Defendants' handling of her FMLA leave requests, Defendants have no obligation to accept the attribution. They are free to discover if other life stressors, i.e., an unfaithful husband or mounting financial pressures leading to bankruptcy, may have caused or contributed to the cause of her present emotional condition. It is not this Court's function at this stage of the proceedings to determine the admissibility of such evidence at trial. However, at the pretrial stages of litigation, relevancy, while not without limits, is broader than questions of admissibility. St. Joseph's Hospital v. INA Underwriters Insurance Co., 117 F.R.D. 24 (D. Maine 1987)

If it were Rodriguez's game plan to not answer many of the questions asked because she or her attorney believed the questions were immaterial or not relevant, the proper procedure was for counsel to make the objection, instruct his client not to answer, and halt the deposition to obtain a ruling from the Court, or to proceed with the deposition and promptly file a motion for protective order. American Hanger, Inc. v. Basic Line, Inc., 105 FRD 173 (D. Mass. 1985). This, Plaintiff did not do. Instead, based on counsel's defense of his client's failure to answer questions or inadequate answers, it appears that Plaintiff and counsel believed it was proper to avoid many of the questions at issue. The Court finds that Rodriguez deliberately and improperly evaded discovery without grounds to do so.

## Analysis

Defendants bring the motion to dismiss for discovery abuse in accordance with the Court's inherent authority to fashion an appropriate sanction, Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991), or to "do whatever is reasonably necessary to deter abuse of the judicial process and assure a level playing field for all litigants." Shangold v. Walt Disney Co., No. 03-9522, 2006 WL 71672, at *4 (S.D.N.Y. Jan. 12, 2006) (unpublished) (plaintiffs materially misrepresented timing of crucial communication and court dismissed case with prejudice and awarded fees and costs). The Court's inherent power "extends to a full range of litigation abuses," including fraud upon the court. Chambers, 501 U.S. at 46. Moreover, when a litigant's conduct abuses the judicial process, the Supreme Court recognized that dismissal of a lawsuit is within the Court's inherent authority. Id. at 45. See Archibeque v. Atchison, Topeka, and Santa Fe Ry. Co., 70 F.3d 1172, 1174 (10th Cir 1995. ("Our case law makes it clear that a district judge may dismiss an action for discovery violations.") See also Martin v. DaimlerChrysler Corp., 251 F.3d 691, 695 (8th Cir. 2001) (finding no abuse of discretion by district court's dismissal of case because dismissal "was the only sanction that would effectively punish [plaintiff], lessen the prejudice to [defendant], and protect the integrity of the proceeding"); Pope v. Federal Express Corp., 974 F.2d 982, 984 (8th Cir. 1992) (when a litigant's conduct abuses the judicial process, dismissal of a lawsuit is a remedy within the court's inherent authority).

In Chavez v. City of Albuquerque, 402 F.3d 1039 (10th Cir. 2009), Judge William Johnson dismissed a plaintiff's 42 U.S.C. § 1983 lawsuit when evidence emerged that the plaintiff Nestor Chavez lied during his deposition and pretrial discovery. Judge Johnson concluded that plaintiff's "willful deceit . . . made a mockery of the judicial process." Id. at 5 (citing Chambers v. NASCO, Inc., 501 U.S. 32 at 44)("tampering with the administration of justice is a wrong against the

institution set up to protect and safeguard the public.") *See also* <u>Hazel v. Atlas Glass Co. V.</u>

<u>Hartford-Empire Co.</u>, 322 U.S. 238, 246 (1944); <u>ABF Freight Systems v. NLRB</u>, 510 U.S. 317, 320

(1984)("the greatest consequences of lying under oath is the affront to the law itself.")  Finding

Chavez's lies to be an affront to the truth-finding process, the judge sanctioned Chavez by dismissal

of the lawsuit.

> Chavez appealed the dismissal, and the Tenth Circuit affirmed, stating:

> > It has long been understood that "[c]ertain implied powers must
> > necessarily result to our courts of justice from the nature of their
> > institutions" powers "which cannot be dispensed with in a court
> > because they are necessary to the exercise of all others."  <u>Chambers</u>
> > <u>v. NASCO, Inc.</u>, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 Fed. 2 27
> > (1991)(*quoting* <u>United States v. Hudson</u>, 7 Cranck 32, 34, 3 L.Ed.
> > 259 (1812); *see also* <u>Smith v. Northwest Financial Acceptance, Inc.</u>,
> > 129 F.3d 1408, 1419 (10th Cir. 1997).  Among the multifarious
> > manifestations of the court's inherent power is the authority to vacate
> > a judgment when a fraud has been perpetuated on the court,
> > <u>Chambers</u>, 501 U.S. 32 at 44, 111 S. Ct. at 2132, such as when a
> > party has perjured himself during the discovery process.  <u>Archibeque</u>
> > <u>v. Atchison Topeka & Santa Fe Railway Co.</u>, 70 F.3d 1172, 1174
> > (10th Cir. 1995).

<u>Chavez v. City of Albuquerque</u>, 402 F.3d at 1043-44.

> <u>Chavez</u> thus authorizes a court to impose the most severe of all sanctions--dismissal--when

the court concludes that a party lied during pretrial discovery.  *See* <u>Archibeque</u>, 70 F.3d 1174-75.

> While this Court relies on <u>Chambers v. NASCO, Inc.</u>, the Tenth Circuit precedent, including

<u>Chavez v. City of Albuquerque</u> and <u>Archibeque v. Atchison Topeka & Santa Fe Railway Co.</u>, it is

significant to note that New Mexico's own substantive law is in accord.

> In <u>Sandoval v. Martinez</u>, 109 NM 5, 78 P.2d 1152 (Ct. App. 1989), Judge Harris Hartz (then

a judge on New Mexico's Court of Appeals and now a Tenth Circuit Judge) affirmed the state

district court's dismissal of Deborah Sandoval's lawsuit on the ground that she lied during pretrial

discovery.[6]  As in the present case, after Sandoval made inaccurate and misleading responses to pretrial discovery, she made no correction or clarification to her earlier responses.  Sandoval, 78 P.2d at 11:53.  Defendants, through their own efforts, discovered that Sandoval had been deceitful in pretrial discovery.  Defendants moved for Rule 37 sanctions, contending Sandoval failed to meet her discovery obligations and, in bad faith, provided false answers.  The trial court agreed and dismissed Sandoval's lawsuit.

On appeal, the issue was whether Sandoval's case should have been dismissed.  In affirming the dismissal, the New Mexico Court of Appeals referred to New Mexico's seminal discovery sanction case, United Nuclear v. General Atomic, 96 N.M. 155, 629 P.2d 231 (1980), when the trial court entered a default judgment against a defendant as a sanction for obstructing discovery.  In United Nuclear, the trial court found that a defendant "stonewalled" and wrongfully obstructing the discovery process.[7]

The conduct in this case involves not only blatantly false answers, but also the wholesale obstruction of the discovery process by Rodriguez's 350 responses of "I don't recall" or "I don't remember" answers.

While it is perfectly understandable that a deponent may not know or may not remember the answers to some questions, it is simply inconceivable that Plaintiff could not recall very basic information about her employment history and earnings, the location of their business, her husband's occupation, her compensation and benefits, her bankruptcy, or her husband's extra-marital affairs.

---

[6]Sandoval v. Martinez, a New Mexico State case, is not binding in federal court, as it deals with state rather than federal law.  However, the policy considerations are compelling.

[7]The default was startling because the claimed damages were in the hundreds of millions of dollars.

In Ehrenhaus v. Reynolds, 965 F.2d 916, 921 (10th Cir. 1992), the court cautioned that before choosing dismissal as a just sanction, a court should ordinarily consider a number of factors, including: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party; and (5) the efficacy of lesser sanctions. Ehrenhaus, 965 F.2d at 921. The court ordinarily considers and address all of the above factors before imposing dismissal as a sanction. However, often some of the five factors will take on more importance than others." Id. at 922. See Archibeque, 70 F.3d at 1174 (five Ehrenhaus factors are not necessarily equiponderant).

The Court further observes that discovery is intended, in part, to make a trial less a "game of 'blindman's bluff' and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." Hickman v. Taylor, 329 U.S. 495, 507 (1947) (citation omitted). As aptly stated by one district court:

> [C]ourts are forums in which people may obtain fair resolution of their disputes in accordance with rules intended to preserve that fairness. Courts have the inherent responsibility to protect the integrity of that form and its processes, and courts should not abrogate that duty to a jury.

United States v. Boeing Co., __ F.Supp.2d __, 2011 WL 6182109, at *32 (D. Or. Dec. 13, 2011) (unpublished). Moreover, "conduct that severely damages the reliability of, and the public's confidence in, the judicial system" may warrant severe sanctions, including dismissal of a claim and monetary sanctions. Id. at *33-34. "Litigants who deliberately engage in such egregious conduct as [the plaintiff]'s committed here should not be permitted to continue to benefit from the judicial process they have corrupted for personal gain."[8] Id. at *32.

------

[8] The plaintiff in Boeing Co. engaged in a much wider variety of discovery abuses than did Rodriguez.

1.      *Degree of Actual Prejudice to Defendants*

The Court finds that Defendants demonstrated sufficient actual prejudice to warrant sanctions against Rodriguez.  As recounted above, Rodriguez clearly lied during her deposition about her casino work, including the start date, the extent of the other work, and the fact that she was working another job while receiving FMLA/STD benefits.  Her conduct presumes that there is no conflict between receiving FMLA/STD benefits from a current employer and taking another job after providing medical documentation that she was unable to work.  It defies logic to believe that Rodriguez was unable to work at PHS in any role, but capable of being a blackjack dealer at a casino during daytime and nighttime hours.

Rodriguez's deception during her deposition, her persistent defense of her lies, and her consistent failure to provide answers to numerous basic questions interfered with integrity of the judicial proceeding.  Moreover, her misconduct during discovery prejudiced Defendants by requiring them to obtain documentation from her casino employer and by taking several records custodian depositions in order to learn the truth of Rodriguez's casino employment.

Rodriguez argues that "[n]othing is more common and routine in the context of federal employment litigation than to take depositions of records custodians from a plaintiff's prior places of employment.  These are not unusual nor [sic] extraordinary acts that can be deemed unnecessary." [Doc. 42, at 19.]  The Court disagrees.  Rodriguez could have provided the basic information regarding her casino employment at the time of her deposition, but, instead, she elected to engage in obstructive tactics that necessitated additional discovery and expense, including the expense of bringing this motion for Defendants.

Moreover, instead of conceding that she engaged in falsehoods about her casino employment, and after failing to correct her answers after the deposition, when confronted with the

truth, Rodriguez argued that either she told the truth, part of the truth, or blamed the Defendants by claiming that the questions were immaterial.  Rather than admit her misconduct, she attacked Defendant McSweeney, counting up the number of times in his deposition that he stated he did not remember a certain detail.[9]  The Court views such tactics as further attempts to obfuscate and to distract from the issues at hand.  In addition, Rodriguez's continued insistence that she told the truth or answered only what she felt she needed to answer prolonged this litigation.  Rodriguez's hyperbole to the contrary, *e.g.,* Defendants' motion is "laced with misrepresentations, distortions, and perversions," "borders on the incredulous," "the pot calling the kettle black," "Defendants' wild and unsubstantiated claims," "Defendants' groundless diatribe of fraud," "Defendants are ignorant of what perjury ... is" "make another feeble argument," "flimsy, contradicted, and contrived facts presented by Defendants," is of no persuasive value in deciding these issues.

Rodriguez's request for monetary damages and attorney's fees under the FMLA, related to claims that Defendants violated the FMLA, interfered with her leave, and retaliated against her for using FMLA leave, along with her request for an award of punitive damages in relation to other claims, are directly contradicted by her work at a casino while accepting FMLA/STD benefits.  This is not a case where Rodriguez appeared to have inadvertently told falsehoods or clumsily failed to answer questions.  In other words, Rodriguez did not act mistakenly; she acted with intent when she decided to answer or not answer the questions as she did.  Rodriguez's actions during discovery constitute a willful fraud on both her employer and the Court. The Court concludes that Rodriguez's fraudulent and obstructive conduct during her deposition prejudiced Defendants.

---

[9]The Court take no stance on whether or not Defendant McSweeney was obstructive during his deposition as Rodriguez did not raise the issue properly by way of a motion.

2.      _Amount of Interference with Judicial Process_

The Court finds that Rodriguez's conduct interfered with the judicial process.  To allow lying during a deposition and continued obstruction of discovery by failure to answer questions would eviscerate the truth seeking function of the judicial process.  Similar to the findings by the District Court in Chavez v. City of Albuquerque, et al., No. CIV 00-307, at *5 WJ/KBM (D.N.M. Aug. 18, 2003) [Doc. 170], _aff'd_, 402 F.3d 1039 (10th Cir. 2005), Rodriguez's false testimony "constituted willful deceit and made a mockery of the judicial process." (_citing_ Chambers, 501 U.S. at 44).  "The gravest consequence of lying under oath is the affront to the law itself."  ABF Freight Sys., Inc. v. N.L.R.B., 510 U.S. 317, 326 (1994).

It is clear that Rodriguez placed no value in the truth-finding process, notwithstanding that truth-finding is exactly the purpose of discovery.  It is through the discovery process that parties can (1) evaluate the strengths and weakness of claims and defenses; (2) determine if a case can be settled; or (3) if it cannot be settled, prepare to meet the proofs at trial.  _See, e.g.,_ Vigil v. Stone, et al., No. 10-947 LFG/WDS [Doc. 51] (D.N.M. Dec. 5, 2011) (unpublished) (internal citations omitted).  Rodriguez's failure to answer questions truthfully or at all compelled the Court to consider this motion, a motion that easily could have been avoided had Rodriguez cooperated in discovery with candid and truthful responses.

The Court concludes that Rodriguez's misconduct significantly interfered with the judicial process.

3.      _Culpability of Litigant_

There is no question that Rodriguez is culpable.  She is the one who told the numerous untruths; she is the one who professed, under oath, 350 times, that she could not recall or could not remember the kinds of information that would generally be front and center of an individual's

recollection.  It is unknown what advice or recommendation was provided Rodriguez, but it is clear that her conduct was willful and intentional.

### 4. *Advance Warning of Possible Dismissal*

The Court did not warn Rodriguez that if she lied during her deposition, her lawsuit could be dismissed with prejudice.  Nor did the Court advise Rodriguez in advance that continued obstruction of the discovery process by giving non-answers to permissible questions could result in a severe sanction, including dismissal.

However, the fact that Rodriguez was not warned of the possibility of dismissal with prejudice does not mean the Court cannot dismiss the lawsuit.  This is especially true when a party swears to tell the truth and then refuses to do so or lies.  In Chavez, the Tenth Circuit addressed this exact issue and rejected the argument that a warning must be given before a case can be dismissed.

> With respect to the factor of whether a prior warning was necessary before the case was dismissed, the Court noted that because the perjurious testimony was given under oath, an additional warning would have been superfluous.  Once a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely, to direct him to tell the truth.  It would render the sanctity of the oath quite meaningless to require admonition to adhere to it.

Chavez, 402 F.3d at 1045 (internal citations and quotations omitted).

Here, Rodriguez does not argue she should have been warned about the possibility of sanctions for lying or obstructing the discovery process.  Instead, she continues to claim she never lied "under any circumstance." [Doc. 42, at 22.] The Court already determined, as discussed above, that Rodriguez lied and that she willfully failed to answer numerous questions.

26

It is clear that when Rodriguez was deposed, she swore to tell the truth.  She failed to do so.  Under these circumstances, Rodriguez's violations are of such a grievous nature that no advance warning of dismissal is necessary.

### 5.        *Efficacy of Lesser Sanction*

The Court concludes that dismissal of the lawsuit with prejudice would deter future litigation abuse and punish the present abuse.  It also would compensate the victims of the litigation abuse and streamline the court's docket.  The Court recognizes that dismissal with prejudice defeats a litigant's right to access to the courts and that it should be used sparingly.  *See* Meade, 841 F.2d at 1520 n.6.  But, the Court is not required to first impose a lesser sanction before the sanction of dismissal with prejudice.  In other words, it is not mandatory for the Court to impose a lesser sanction first.  Hobratschk v. Perretta, 210 F.3d 389, 2000 WL 313530, at *2 (10th Cir. Mar. 28, 2000) (unpublished) internal citations omitted).

Here, based on Rodriguez's continuing and flagrant discovery abuses, the Court determines that a lesser sanction than dismissal with prejudice, would not better serve the interests of justice.  Stated differently, Rodriguez's misconduct and continued defense of that misconduct justify, not merely a monetary sanction or dismissal of a single claim, but instead, the sanction of dismissal with prejudice.  Indeed, numerous cases support the Court's authority to dismiss a case for perjury or fabricating evidence.  *See* Vaughan v. Brigham, 2011 WL 2633369 (E.D. Ky July 5, 2011) (unpublished) (collecting cases)

### Recommended Disposition

For all of the above-stated reasons, the Court recommends that Rodriguez's complaint and this action be dismissed, with prejudice, for discover abuses.  The Court further recommends that Defendants' request for attorneys' fees or monetary sanctions be denied.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge